# EXHIBIT B

*Ferrell v. Colourpop Cosmetics*, No. 2:25-cv-01324-SPG-AJR
(C.D. Cal. July 21, 2025) (ECF 38)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMBER FERRELL, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>COLOURPOP COSMETICS, LLC,<br><br>              Defendant. | Case No. 2:25-cv-01324-SPG-AJR<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION, OR ALTERNATIVELY, TO DISMISS, AND MOTION TO STAY DISCOVERY [ECF NOS. 26, 27]** |

      Before the Court is the Motion to Compel Arbitration, or Alternatively, to Dismiss (ECF No. 26 ("MTCA")) filed by Defendant Colourpop Cosmetics, LLC ("Defendant"). Also before the Court is Defendant's Motion to Stay Discovery. (ECF No. 27 ("Mot. to Stay," or, together with the MTCA, the "Motions")). The Court has read and considered the Motions and concluded that they are suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES the Motions.

**I.    BACKGROUND**

      The following allegations are taken from Plaintiff Amber Ferrell's ("Plaintiff") First Amended Complaint. (ECF No. 23 ("FAC")). Plaintiff is the subscriber and customary user of a cell phone number with area code 918, which is used for personal purposes and

is not associated with a business. (*Id.* ¶¶ 9, 12). Plaintiff registered this cell phone number to the National Do Not Call Registry at least thirty days prior to any calls or text messages at issue here. (*Id.* ¶ 10). From October 2024 to January 2025, Plaintiff received marketing text messages from Defendant, which were intended for someone other than Plaintiff. (*Id.* ¶¶ 14, 16). Plaintiff did not request information or promotional materials from Defendant and did not give Defendant permission to deliver the text messages. (*Id.* ¶¶ 18-19).

Plaintiff seeks to represent a putative class, consisting of all persons in the United States who, within the four years prior to the filing of this case, registered their telephone numbers on the National Do Not Call Registry for at least 31 days but received more than one telemarketing call from Defendant within a twelve-month period. (*Id.* ¶ 23). Plaintiff asserts a single claim for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and seeks statutory and treble damages, as well as injunctive relief. (*Id.* at 13-14).

Plaintiff initiated this action on February 14, 2025, naming a different party—Seed Beauty, LLC—as the sole defendant. (ECF No. 1). Following a stipulation by the parties, the Court granted Plaintiff's request to substitute parties and permitted Plaintiff to file the FAC. (ECF No. 22). Plaintiff filed the FAC on April 10, 2025. (FAC).

On June 9, 2025, Defendant filed the two Motions. (MTCA; Mot. to Stay). Plaintiff filed untimely oppositions to the Motions on June 24, 2025. (ECF Nos. 28 ("Opp. to MTCA"), 29 ("Opp. to Mot. to Stay")). Despite the violation of Local Rule 7-9, the Court, its discretion, accepted the untimely oppositions and provided Defendant additional time to file its replies. (ECF No. 33). On July 16, 2025, Defendant filed its replies in support of the Motions. (ECF Nos. 37 ("MTCA Reply"); 38 ("Mot. to Stay Reply")).

## II.     LEGAL STANDARD

### A.     Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") provides that written arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2). A court's role under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citation omitted). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

**B.     Motion to Dismiss**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

When ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is "not required to accept as true allegations that contradict exhibits attached to

the Complaint or matters properly subject to judicial notice," nor must it accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## III. DISCUSSION

### A. Motion to Compel Arbitration

In seeking to compel arbitration of Plaintiff's claims, Defendant asserts that Plaintiff agreed to certain terms and conditions while using Defendant's website. (MTCA at 10). Defendant provides sworn declarations from Zach Shuler, Defendant's CFO, and Andrew Sega, the Senior Director of Engineering at Attentive Mobile, Inc.—the company through which Defendant sent its marketing texts. *See* (ECF No. 26-1 ("Shuler Declaration"); ECF No. 26-2 ("Sega Declaration")). According to Shuler, Defendant's records show that, on September 20, 2023, a user visited Defendant's website and was shown a promotional advertisement. (Shuler Decl. ¶ 6). The user then clicked a button stating, "Get 15% off now when you sign up for email and texts." (*Id.* ¶ 7). Seconds later, the user sent a message from Plaintiff's phone number, confirming the desire to sign-up for marketing text messages. (*Id.* ¶ 8). Defendant's records reflect the type of phone, browser, and specifications used, and that the user accessed the website via Instagram. (*Id.* ¶ 11). Defendant's records show that since the initial opt-in, the user has never revoked consent or otherwise attempted to opt out of marketing messages. (*Id.* ¶ 12). Sega attests to much the same information, based on Attentive Mobile, Inc.'s records. *See* (Sega Decl. ¶¶ 3-8).

Defendant also provides a screenshot of the promotional advertisement, the text of which reads:

> You've won 15% off your first order. By signing up via text, you agree to receive recurring automated promotional and personalized marketing text messages (e.g. cart reminders) from ColourPop at the cell number used when signing up. Consent is not a condition of any purchase. Reply HELP for help

-4-

and STOP to cancel.  Msg frequency varies.  Msg and data rates may apply. View Terms & Privacy.  Get 15% off now when you sign up for email and texts.

(Shuler Decl. ¶ 6).  The words "Terms" and "Privacy" were each underlined with clickable hyperlinks.  (*Id.* ¶ 15).  At the link, the Terms provide that "any dispute arising out of or in any way related to these messaging terms and conditions . . . or your receipt of text messages from ColourPop or its service providers will be resolved by binding arbitration." (*Id.* ¶ 17).  Relying on this information, Defendant argues that Plaintiff signed up to receive text messages and, in doing so, consented to the arbitration of disputes relating to the messages.  (MTCA at 10-14).

Plaintiff responds that there is no agreement to arbitrate because she never gave Defendant her phone number or signed up for marketing messages.  (Opp. to MTCA at 4). According to Plaintiff's sworn declaration, she has never purchased any of Defendant's products, has never visited Defendant's website, has never clicked on any of Defendant's online offers, and rarely, if ever, spends any money on makeup or beauty products.  (ECF No. 28-1 ("Ferrell Declaration") ¶¶ 3-4).  She later reiterates that she did not click "get 15% off" or otherwise agree to receive text messages from Defendant.  (*Id.* ¶ 7).  Plaintiff indicates that the text messages she has received are addressed to "Shana," which is not a name that Plaintiff has ever used.  (*Id.* ¶ 5).

As discussed above, a court's role under the FAA is solely to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore*, 718 F.3d at 1058.  In assessing the existence of an agreement to arbitrate, courts should apply a "summary judgment standard . . . because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (internal quotation marks and citation omitted).   Thus, "[i]n considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate was made, a district court should give to the opposing party the benefit of all reasonable doubts and inferences that may

-5-

arise." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004). "Only when there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement." *Id.* In making this determination, the Court may consider "the pleadings, documents of uncontested validity, and affidavits submitted by either party." *Chien v. Bumble Inc.*, 641 F. Supp. 3d 913, 932 (S.D. Cal. 2022) (citation omitted).

Based on the sworn affidavits from the parties, there is a genuine dispute of material fact as to whether the parties entered into an agreement to arbitrate. While Defendant's records establish that *someone*, using Plaintiff's phone number, signed up to receive text messages, they do not incontrovertibly establish that it was Plaintiff that made this agreement. To the contrary, Plaintiff's sworn attestation that she has never visited Defendant's website and that the text messages are addressed to someone else create a material factual dispute as to whether she made an agreement to arbitrate. If it was not Plaintiff but some unidentified third party who signed up for the text messages, then no arbitration agreement exists between these parties.

In its reply brief, Defendant cites to *Hill v. ActiveProspect, Inc.*, No. 20-cv-01351-JGB-KK, 2021 WL 9880874 (C.D. Cal. July 16, 2021) and *Dobbs v. Health IQ Insurance Services, Inc.*, NO. 21-5276, 2022 WL 2974713 (E.D. Pa. July 27, 2022) to argue that "[c]ourts often compel arbitration even in the face of conflicting evidence regarding whether a TCPA plaintiff agreed to terms containing an arbitration agreement." (MTCA Reply at 2). However, both of these cases are distinguishable. In *Hill*, the court compelled arbitration only following a contested evidentiary hearing, based on its factual finding that the plaintiff's contentions were "implausible." 2021 WL 9880874, at *6. Here, the Court has not held any evidentiary hearing and cannot resolve the genuine factual disputes on the papers. And under the FAA, given that Plaintiff has demanded a jury trial on this issue, the Court cannot resolve this dispute via an evidentiary hearing. *See* 9 U.S.C. § 4 (permitting courts to "hear and determine" disputes over the making of an arbitration agreement "[i]f no jury trial be demanded," but stating that "upon such demand the court

-6-

shall make an order referring the issue or issues to a jury"). In *Dobbs*, meanwhile, the court found no genuine dispute of material fact as to the formation of an agreement to arbitrate because the plaintiff made only a "conclusory statement that he did not enter into any agreement" without explicitly "deny[ing] that he submitted the online form on Defendant's website." 2022 WL 2974713, at *4. Here, by contrast, Plaintiff's declaration creates a genuine dispute of material fact as to the formation of an agreement to arbitrate because Plaintiff explicitly states that she has "never visited [Defendant's] website or clicked any of their online offers." (Plaintiff's Decl. ¶ 4).

Defendant also argues that Plaintiff's "credibility is questionable" because of certain inconsistencies between Plaintiff's Declaration and Opposition. (MTCA Reply at 3). But credibility is a quintessential issue for the fact-finder to weigh; any alleged inconsistency in Plaintiff's statements does not change that there is a material dispute under a summary judgment standard. *See In re Jennings*, 671 F. App'x 495, 495 (9th Cir. 2016) ("Credibility determinations must be left for the jury and must not be resolved on summary judgment."). Finally, Defendant argues that there is an "express delegation to the arbitrator" in the arbitration agreement and that this threshold issue of arbitrability should be decided by the arbitrator, not the Court. (MTCA Reply at 4). However, "a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).

Because there is a genuine dispute of material fact as to whether an agreement to arbitrate exists, the Court cannot compel arbitration. The Motion to Compel Arbitration is therefore DENIED without prejudice. Because Defendant has not established an entitlement to arbitration at this time, Defendant's Motion to Stay discovery pending arbitration is also DENIED.

As mentioned above, Plaintiff has demanded a jury trial to determine whether an agreement to arbitrate exists. *See* (Opp. to MTCA at 5). Under 9 U.S.C. § 4, courts must compel arbitration where "satisfied that the making of the agreement for arbitration or the

failure to comply therewith is not in issue." However, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.* If the party opposing arbitration does not demand a jury trial, the court may hold a bench trial on this issue. *Hansen*, 1 F.4th at 670. However, "if a jury trial is demanded, 'the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.'" *Id.* (quoting 9 U.S.C. § 4).

While the Court agrees that Plaintiff would be entitled to a trial on this issue, it appears that a period of discovery and potentially a motion for summary judgment on this issue would be appropriate prior to any trial. *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 833 (9th Cir. 2022) (identifying "three phases" of procedure under the FAA: "a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment, if the motion is denied; followed by a mini-trial, if necessary"). To the extent Defendant seeks to re-raise the issue of arbitration following the Court's denial of the instant Motion, the parties should meet and confer and, if needed, propose a schedule in line with the procedure articulated in *Knapke*.

**B.    Motion to Dismiss**

In the alternative, Defendant argues that the FAC should be dismissed under Rule 12(b)(6) on three grounds: (1) Plaintiff failed to sufficiently allege that the telephone number is a "residential" number within the meaning of the TCPA; (2) Plaintiff lacks standing to seek injunctive relief; and (3) Plaintiff's treble damages claim lacks sufficient allegations of willful or knowing conduct.

1.    <u>Residential Telephone Numbers</u>

First, Defendant argues that Plaintiff has failed to sufficiently allege that she is a "residential telephone subscriber" within the meaning of the TCPA. (MTCA at 23). However, under FCC regulations, the rules for residential telephone subscribers "are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e). Applying this

regulation, the Ninth Circuit in *Chennette v. Porch.com, Inc.*, concluded that "a presumptively residential cell phone can be residential even when used for both personal and business purposes." 50 F.4th 1217, 1224 (9th Cir. 2022). In so concluding, the Ninth Circuit noted the FCC's conclusion that "a cell phone registered on the do-not-call registry is presumptively a residential phone." *Id.* at 1223. Under *Chennette*, because Plaintiff alleges that she has registered the cell phone and that it is a "residential number," used for "personal purposes" and "not associated with a business," Plaintiff has adequately alleged that she is a residential telephone subscriber within the meaning of the TCPA. *See* (FAC ¶¶ 11-12).

Defendant argues that under the Supreme Court's decisions in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) and *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. ___, 145 S. Ct. 2006 (2025), the Court is obligated to undertake an independent review of the statutory text and not rely on the FCC's interpretations as binding. (Reply at 4-5). As an initial matter, however, this Court remains bound by *Chennette* unless it has been "effectively overruled," meaning that the "reasoning or theory" of the decision "is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). This is a "high standard" and "[i]t is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (citations omitted).

The Court is not convinced that *Chennette* has been "effectively overruled" by subsequent Supreme Court decisions. In *Loper*, the Supreme Court abrogated the doctrine of "*Chevron* deference" and returned to "the traditional rule that 'questions of statutory interpretation . . . are for the courts to resolve, giving appropriate weight'—not outright deference—'to the judgment of those whose special duty is to administer the questioned statute.'" *Loper*, 603 U.S. at 390 n.3 (quoting *NLRB v. Hearst Publ'ns., Inc.*, 322 U.S. 111, 130-31 (1944)). It is not clear that the Ninth Circuit's decision in *Chennette* ran afoul of

-9-

*Loper*. While the *Chennette* court did rely heavily on the FCC's interpretation of the statutory language, it did not explicitly apply the two-step framework from *Chevron*. *See Chennette*, 50 F.4th at 1223-25. And *Loper* itself does not prohibit *all* reliance on agency interpretations of statutory language. *See Loper*, 603 U.S. at 388. Moreover, to the extent the *Chennette* court did apply an incorrect framework, it is far from clear that the Ninth Circuit would reach a different result under the *Loper* framework.

However, even if the Court were not bound by *Chennette* and could instead conduct an independent analysis of the statutory text, the Court would not conclude that the term "residential telephone" as used in 47 U.S.C. § 227(c)(1) excludes all cell phones. Starting with the plain language of the statute, § 227(c) confers on the FCC the obligation to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c). In 1991, when the TCPA was enacted, Webster's Dictionary defined "residential" as "used as a residence or by residents." *See Wilson v. Hard Eight Nutrition LLC*, No. 6:25-cv-00144-AA, 2025 WL 1784815, at *5 (D. Or. June 27, 2025) (quoting *Residential*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY). In the context of the statute, the word "residential" modifies the phrase "telephone subscribers," requiring courts to look to whether the telephone subscription is for "residential" use in the home, or for another purpose, such as business. This distinction between "residential subscribers" and "business subscribers" is the same one drawn elsewhere in the statute. *See* 47 U.S.C. § 227(a)(2)(A). Thus, the term "residential telephone subscribers" can be understood to refer to "individuals, subscribers, who make regular payments to *use* telephone service at home, that is, people who use a telephone for a personal or private purpose." *Wilson*, 2025 WL 1784815, at *5. Under the plain language of the statute, it is the *use* of the phone, not the technology underlying the phone, that determines whether the phone qualifies for protection. This interpretation is consistent with the statutory focus on "privacy rights," because the intrusion on telephone subscribers' privacy would be the same when a call is made to any personal phone used in the home, whether wireline or wireless.

-10-

1    The congressional purpose in enacting the TCPA also supports this construction. 
2    *See United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) ("Particular phrases 
3    must be construed in light of the overall purpose and structure of the whole statutory 
4    scheme." (citation omitted)).  The purpose of the TCPA is to "protect the privacy interests 
5    of residential telephone subscribers by placing restrictions on unsolicited, automated 
6    telephone calls to the home."  S. Rep. 102-178, at 1968 (1991).  Thus, Congress was 
7    principally concerned with unwanted intrusions into the home.  Categorizing phones based 
8    on their particular use—whether residential or business—rather than the transmission 
9    technology that underpins the phone, would serve this purpose by ensuring that phones 
10   used within the home are protected from intrusion.  A contrary interpretation "would 
11   protect the privacy interest of a home landline subscriber but not a home cellular 
12   subscriber—even when a cell phone is the sole phone for home use, as is increasingly the 
13   case." *Wilson*, 2025 WL 1784815, at *6.

14   Moreover, while the Court is not bound by the FCC's interpretation of the statute, it 
15   must still "afford[] appropriate respect to the agency's interpretation." *McLaughlin*, 145 
16   S. Ct. at 2015.  Indeed, *Loper* reaffirmed precedents requiring courts to give "deferential 
17   review upon concluding that a particular statute empowered an agency to decide how a 
18   broad statutory term applied to specific facts found by the agency." *Loper*, 603 U.S. at 
19   388.  Respect for the FCC's interpretation is particularly warranted here.  The TCPA grants 
20   the FCC authority "to initiate a rulemaking proceeding concerning the need to protect 
21   residential telephone subscribers' privacy rights."  47 U.S.C. § 227(c)(1).  Under 
22   § 227(c)(5), it is a violation of the resulting *regulations*, not a violation of the statute itself, 
23   that is the basis for the private cause of action.  Given the special role that Congress has 
24   created for the FCC in this context, its interpretations are entitled to deferential review, 
25   even under *Loper*.

26   Additionally, under *Loper*, the Court may give an agency judgment "great weight," 
27   depending on the "'thoroughness evident in its consideration, the validity of its reasoning, 
28   its consistency with earlier and later pronouncements, and all those factors which give it 

-11-

power to persuade, if lacking power to control.'" *Loper*, 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The regulation at issue here is premised on the FCC's 2003 report, titled "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991." 18 F.C.C.R. 14014 (2003); *see* 47 C.F.R. § 64.1200(e). This 179-page report was issued following a notice of proposed rulemaking, which sought comment on whether the Commission's rules needed to be revised to carry out the goals of the TCPA more effectively. *Id.* at 14026. In the report, the FCC noted that the vast majority of consumers and consumer groups "contend that telemarketing calls to cell phones are as intrusive of consumers' privacy interests as calls to landline phones," and that a number of industry members agreed, "in part because of the difficulty in distinguishing between wireline and wireless numbers." *Id.* at 14114. Based on feedback from all relevant stakeholders, the FCC concluded that "wireless subscribers should be afforded the same protections as wireline subscribers" with respect to telemarketing calls." *Id.* at 14116. The Court finds the FCC's reasoning to be thorough and valid. While the Court does not rely solely on the FCC's interpretation, the interpretation is a persuasive factor alongside the Court's reading of the statutory text and purpose.

      Defendant points out that, elsewhere, the TCPA distinguishes between the terms "cellular telephone service" and "residential telephone lines." Defendant contends that this demonstrates that Congress did not intend to cover cell phone subscribers in § 227(c). It is true that § 227(b) distinguishes between these two terms: § 227(b)(1)(A)(iii) prohibits calls to lines associated with a "cellular telephone service" by "any automatic telephone dialing system or an artificial or prerecorded voice," whereas § 227(b)(1)(B) prohibits initiating calls to "residential telephone lines" only by "an artificial or prerecorded voice." But the fact that § 227(b) distinguishes between these terms does not mean that § 227(c) must exclude cell phones used for residential purposes. As several courts have pointed out, the scope and structure of § 227(b) are "markedly different" than that of § 227(c). *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 201 (S.D.N.Y. 2024). Section 227(b) establishes certain restrictions on the "use of automated telephone equipment" and

-12-

distinguishes among recipients not based on their privacy interests but based on the cost of receiving calls on particular transmission systems. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (imposing broader restrictions on automated telephone dialing for "any service for which the called party is charged for the call"); *Lyman v. QuinStreet, Inc.*, No. 23-cv-05056-PCP, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024) ("[T]he statutory text suggests that the reason cellular phone lines were subjected to broader restrictions was that recipients of calls on such lines were generally charged for the call."). Section 227(c), by contrast, is titled "[p]rotection of subscriber privacy rights" and, as discussed above, focuses on the use to which the phone is put and the effect on subscribers' privacy rights, rather than the underlying technology. Importing a distinction used in § 227(b) would thus make little sense. Importantly, § 227(c) "never references any such thing as a 'residential telephone;' only 'telephone subscribers' and 'residential subscribers.'" *Jackson v. Direct Building Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449, at *6 (M.D. Pa. Jan. 17, 2024). If Congress intended to limit § 227(c) based on the transmission technology of the phone, instead of the character of the subscription, it would have done so; the different language used in §§ 227(b) and (c) shows that Congress did not intend parallel meanings of these two sections. That Congress distinguished in a separate provision of the statute between "residential telephone lines" and "cellular telephone service" does not mean "the two groups cannot overlap" where Congress used different language. *See Lyman*, 2024 WL 3406992, at *4.

As discussed, the Court remains bound by the Ninth Circuit's decision in *Chennette*. But even if not, based on the statutory text and purpose, and affording appropriate respect to the FCC's interpretation, the Court would conclude that the TCPA does apply to cell phone subscribers, at least where the phone in question is used for residential purposes. In so concluding, the Court joins other district courts in this Circuit that have rejected post-*Loper* challenges to *Chennette*. *See Wilson*, 2025 WL 1784815, at *7; *Lyman*, 2024 WL 3406992, at *4.

-13-

|   |   |
|---|---|
| 1 | 2. <u>Injunctive Relief</u> |

Next, Defendant contends that Plaintiff's request for injunctive relief should be dismissed for lack of standing. (MTCA at 26). Defendant argues that the FAC alleges that Plaintiff received texts only up through January 2025 and has not otherwise shown a threat of future harm or repeated injury. (*Id.*). However, while the most recent text messages mentioned in the FAC are from January 2025, Plaintiff only initiated this suit in February 2025. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). Before filing suit, Plaintiff documented receiving text messages from Defendant at least once a month from October 2024 to January 2025. Nowhere in the Complaint does Plaintiff indicate that she has stopped receiving these text messages. Given that Plaintiff continually received these messages in the months leading up to this suit, it is plausible, for purposes of a motion to dismiss, that she will continue to receive the texts. The statute itself requires only a showing that the plaintiff "has received more than one telephone call within any 12-month period." 47 U.S.C. § 227(c)(5). Moreover, this is a class action complaint. Thus, to the extent Plaintiff stops receiving the text messages, classwide injunctive relief could still be warranted so long as the complaint plausibly alleges "that members of the proposed class face a real and immediate threat of receiving calls from [Defendant] that allegedly violate the TCPA." *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 900-01 (N.D. Ill. 2017). A contrary rule would allow telemarketers to "cease calls to any individual the instant she is named as a plaintiff and thereby indefinitely evade prospective relief, while continuing the unlawful practice against everyone else." *Id.* at 901; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (internal quotation marks and citation omitted)).

### 3. Treble Damages

Finally, Defendant argues that the demand for treble damages should be dismissed because the allegations that Defendant's violations were "willful or knowing" are merely conclusory. (*Id.* at 28-30). However, under Federal Rule of Civil Procedure 8(a), while a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," the plaintiff need only provide "a demand for the relief sought." Fed. R. Civ. P. 8(a)(2), (3). Rule 12(b)(6), in turn, "only countenances dismissal for failure to state a claim," and is therefore "not a proper vehicle to challenge a plaintiff's prayer for punitive damages." *Elias v. Navasartian*, No. 1:15-cv-01567-LJO-GSA-PC, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17, 2017); *see also Zaiza v. Clark*, No. 1:19-cv-01476-DAD-GSA-PC, 2021 WL 5853325, at *15 (E.D. Cal. Dec. 9, 2021) (stating that "a Rule 12(b)(6) motion to dismiss for failure to state a claim is not a proper vehicle to challenge a plaintiff's prayer for punitive damages" and collecting cases); 5 Wright & Miller, Fed. Prac. & Proc. §1255 (4th ed. 2025) ("The sufficiency of a pleading is tested by the Rule 8(a)(2) statement of the claim for relief and the demand for judgment is not considered part of the claim for that purpose."). Furthermore, under Federal Rule of Civil Procedure 54(c), outside of default judgments, "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Therefore, it would make "little sense to require detailed factual allegations to support a demand for certain damages when such damages may ultimately be awarded even if they were never pled in the complaint." *Elias*, 2017 WL 1013122, at *5. While Defendant cites a handful of cases dismissing claims for treble damages, several of these cases were decided on default judgment rather than a motion to dismiss, such that Rule 54(c) did not apply. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015); *Fania v. Verified Docu Serv., Inc.*, No. 8:22-cv-2652-MSS-CPT, 2024 WL 1012963 (M.D. Fla. Mar. 8, 2024); *Perrong v. MLA Int'l, Inc.*, No. 6:20-cv-1606-RBD-EJK, 2022 WL 1238603 (M.D. Fla. Mar. 2, 2022). And given the language in the Federal Rules, the Court is unpersuaded by the other cases cited by Defendant.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES the Motion to Compel Arbitration and the Motion to Stay, without prejudice.  To the extent Defendant seeks to re-raise the arbitration issue in the future, the parties are ORDERED to meet and confer and propose a schedule for discovery, summary judgment, and a jury trial, as needed.

The Court also DENIES Defendant's Motion to Dismiss.  Defendant shall file a response to Plaintiff's FAC within twenty-one (21) calendar days of the issuance of this order.

**IT IS SO ORDERED.**

DATED: July 22, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE